**Jane E. HODGSON, M.D., et al.,**
**Plaintiffs,**

v.

**Wendell R. ANDERSON, Governor of**
**the State of Minnesota, et al.,**
**Defendants.**

**Civ. No. 4–74–155.**

United States District Court,
D. Minnesota,
Fourth Division.

June 28, 1974.

---

Roy Lucas, Washington, D. C., Maynard E. Pirsig, Gary B. Crawford, Minneapolis, Minn., for plaintiffs.

Dennis J. Horan, Chicago, Ill., Roger A. Nurnberger, Minneapolis, Minn., for defendants Minnesota Citizens For Life Inc., (MCCL), Marjory Mecklenburg, Rosemarie Johnson and Darla St. Martin; William J. Hassing, St. Paul, Minn., co-counsel for MCCL; Mary Louise Klas, St. Paul, Minn., co-counsel for Marjory Mecklenburg; John F. Angell, St. Louis Park, Minn., co-counsel for Rosemarie Johnson; Gordon C. Moosbrugger, St. Paul, Minn., co-counsel for Darla St. Martin.

Michael McGlennen, Asst. Hennepin Co. Atty., Minneapolis, Minn., for defendant Gary Flakne.

Warren R. Spannaus, Atty. Gen., Peter W. Sipkins, Sol. Gen., Richard Wexler, and Thomas H. Jensen, Special Asst. Attys. Gen., St. Paul, Minn., for defendant Warren Lawson.

Before ROSS, Circuit Judge, Denney, District Judge, and BENSON, District Judge.

## MEMORANDUM OF DECISION

BENSON, District Judge.

This action was commenced by the filing of a verified complaint on March 25, 1974. Plaintiffs seek declaratory and

injunctive relief pursuant to 28 U.S.C. §§ 1343, 1331 and 2201, and 42 U.S.C. §§ 1983 and 1985.

The parties to the complaint are Marjory Moe [1] allegedly seeking an abortion at the time the action was brought, and five doctors, all licensed to practice medicine in the State of Minnesota. Four of the doctors are specialists in obstetrics and gynecology, and one is a specialist in family practice. They challenge certain provisions of the recently enacted Minnesota Abortion Law,[2] the Regulations for the Termination of Pregnancy which were promulgated by the Minnesota State Board of Health pursuant to § 144.12 of the Minnesota Statutes, (reproduced as Appendix A and B), and the "Church Amendment" to the Social Security Act, Medical Facilities Construction and Modernization Amendments of 1970, P.L. 93–45, 87 Stat. 91, Tit. 4, § 401(b)(2)(A).

On April 6, a three judge district court was designated on plaintiffs' application and pursuant to Title 28 U.S.C. § 2281. On the basis of the verified complaint, the Court, on April 26, 1974 (Benson, J.), granted the plaintiffs' motion for a temporary restraining order against Defendants Randall, Flakne and Spannus to enjoin them from enforcing Section 2, Subdivision 3(2) and (3) of the Minnesota Abortion Statutes. Oral argument on the plaintiffs' application for a preliminary injunction was heard on April 26, 1974, and a preliminary injunction was entered on May 3, 1974, which enjoined the enforcement of Section 2, Subdivision 3(2) and (3) of S.F. No.498 (Minnesota Statutes § 145.412 Subd. 3(2) and Subd. 3(3) (1974)), and Section 2, Subdivision 1(3) of S.F.No. 498 (Minnesota Statutes § 145.412, Subd. 1(3) (1974)), and Section 6 of S. F.No.498 (Minnesota Statutes § 145.416 (1974)), and the "Regulations for the Termination of Pregnancy" issued pursuant thereto, to the extent that Section 2, Subd. 1(3) and Section 6 and the Regulations applied to procedures for obtaining abortions during the first trimester.

At the April 26 hearing, Defendants Anderson, Thorup, Quirin and Spannus moved, pursuant to Rule 12(h) and 12(f) of the Federal Rules of Civil Procedure, for an order dismissing the complaint against them. On May 6, 1974, the plaintiff moved to dismiss Defendants Anderson, Thorup, Quirin, MCCL, Mickelberg, Johnson and St. Martin from the action, and moved to dismiss the 42 U.S.C. § 1985 claim for damages, on the grounds that the claims asserted against those defendants unnecessarily complicated the case and that any interest those defendants might have would be adequately protected by Defendant Spannus. On May 23, 1974, the Court entered an order dismissing the claim for damages under 42 U.S.C. §§ 1983 and 1985, and all claims by or against Defendants Anderson, Thorup, Quirin, MCCL, Mickelberg, Johnson and St. Martin, with the proviso that these defendants could continue their participation in the action as amicus curiae.

Remaining as defendants to the action are William B. Randall, Ramsey County Attorney; Warren Spannus, Minnesota Attorney General; Gary W. Flakne, Hennepin County Attorney; Dr. Warren Lawson, Minnesota Commissioner of Health; and William B. Wallace, President of United Hospitals. The matter came before the court for final hearing on the merits on May 28, 1974.

There is pending before the Court a motion to dismiss filed by Defendant Wallace on May 3, 1974. This motion will be considered before taking up the Constitutional questions presented, but first it is necessary to enumerate the issues remaining in the case.

---

1. a pseudonym.

2. Minnesota Laws 1974, Ch. 177, codified as Minn.Stat. § 145.411 effective as of March 22, 1974.

## ISSUES

The plaintiffs challenge the following provisions of the abortion law:

1. Sec. 1, Subd. 2 of S.F.No.498 (Minn.Stat. § 145.411, subd. 2 (1974)), providing that:

"'Viable' means able to live outside the womb even though artificial aid may be required. During the second half of its gestation period a fetus shall be considered potentially 'viable'".

The plaintiffs say that this section ignores the clear definition of viability announced by the Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973), as "viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks", at 160, 93 S.Ct. at 730. The parties are in agreement that the normal duration of human pregnancy, counting from the last menstrual period, is 40 weeks, and plaintiffs contend that the Minnesota Statute sets the point of viability at 20 weeks, which is contrary to Roe. The defendants urge that the Court in Roe did not decide at what point viability occurs in the development of the human fetus. It is their contention that viability is a relative concept, subject to revision as technology in the care of premature infants progresses, and that the Minnesota Statutes placing viability at 20 weeks is a reasonable legislative determination which must be upheld.

2. Section 2, Subd. 3(2) of S.F.No. 498 (Minn.Stat. § 145.412, Subd. 3(2) (1974)) providing that:

"It shall be unlawful to perform an abortion when the fetus is potentially viable unless . . . the attending physician certifies in writing that in his best medical judgment the abortion is necessary to preserve the life or health of the pregnant woman;"

3. Section 2, Subd. 3(3) of S.F. 498 (Minn.Stat. § 145.412, Subd. 3(3) (1974)) which further provides that:

"to the extent consistent with sound medical practice the abortion is performed under circumstances which will reasonably assure the live birth and survival of the fetus"

The plaintiffs charge that these provisions, Subd. 3(2) and 3(3) of Section 2, also ignore the Supreme Court guidelines in that they create a situation which would require the attending physician who wishes to perform an abortion in the second half of pregnancy, but before the point of viability, to certify to its life saving necessity and carry out the abortion so as to insure fetus survival. They contend that Roe does not require this certification as it interferes with the doctor's practice of medicine and subjects the woman to a more dangerous medical procedure. The provisions are defended on the grounds that after the point of viability the state possesses a compelling interest in the protection of human life and that the above provisions merely serve to insure that an abortion sought after the point of viability will be provided only if necessary to save the life or health of the woman. The written certification requirement, say the defendants, does not interfere with the basic decision to abort. This is still left to the woman and her doctor. The requirement that post-viability abortions be performed so as to assure live birth is not absolute, according to the defendants, but is required only when such a procedure would be consistent with sound medical practice.

4. Section 3, Subd. 1 of S.F.No.498 (Minn.Stat. § 145.413, Subd. 1 (1974)), provides for the promulgation of a terminated pregnancy reporting system by the Minnesota State Board of Health. The plaintiffs object to the use of the term "potentially viable" as it defines the point at which an abortion must be reported.

5. Section 1, Subd. 4 of S.F.No.498 (Minn.Stat. § 145.411, Subd. 4 (1974)) defines "Abortion Facility" as

"those places properly recognized and licensed by the state board of health under lawful rules and regulations

promulgated by the board for the performance of abortions."

6. Section 2, Subd. 1(3) of S.F.No. 498 (Minn.Stat. § 145.412, Subd. 1(3) (1974)), provides that it shall be unlawful to perform an abortion unless it is performed

"in a manner consistent with the lawful rules and regulations promulgated by the state board of health."

7. Section 6 of S.F.No.498 (Minn. Stat. § 145.416 (1974)) directs the state board of health to license and provide regulations for abortion facilities as defined in Section 1, Subd. 4.

The plaintiffs urge that because these provisions, Section 3, Subd. 1, Section 1, Subd. 4, Section 2, Subd. 1(3), and Section 6, make no distinction between the first and second trimesters, they operate to generally restrict the availability of abortion in the first trimester and restrict the physician-patient decision making process. The defendants' position is that these regulations meet the test recognized in both *Roe* and Word v. Poelker, 495 F.2d 1349 (8th Cir. 1974), that standards adopted to govern abortions be no different than those applicable to other medical procedures.

8. Section 2, Subd. 1(4) of S.F.No. 498 (Minn.Stat. § 145.412, Subd. 1(4) (1974)) provides that it is illegal to perform an abortion unless it is performed

"with the consent of the woman submitting to the abortion after a full explanation of the procedures and effect of the abortion."

9. Section 2, Subd. 2 of S.F.No.498 (Minn.Stat. § 145.412, Subd. 2 (1974)), makes it unlawful to perform an abortion

"upon a woman who is unconscious except if the woman has been rendered unconscious for the purpose of having an abortion or if the abortion is necessary to save the life of the woman."

The plaintiffs object to the informed consent requirement as potentially arbitrary and overbroad in that it could extend the requirement of informed consent as it applies to prospective abortions beyond the informed consent requirements applicable to other medical procedures. The defendants' response is that the provision is merely a statutory enactment of the common law tort rule of informed consent. The prohibition of abortions on a woman who is unconscious hinges on the informed consent requirement, and according to defendants, simply insure that unless necessary to save the life of the woman, an abortion will not be performed upon an unconscious woman, unable to give consent.

10. Section 5 of the S.F.No.498 (Minn.Stat. § 145.415 (1974)) is challenged in its entirety.

Subd. 1. "A potentially viable fetus which is live born following an attempted abortion shall be fully recognized as a human person under the law."

Subd. 2. "If an abortion of a potentially viable fetus results in a live birth, the responsible medical personnel shall take all reasonable measures, in keeping with good medical practice, to preserve the life and health of the live born person."

Subd. 3. "(1) Unless the abortion is performed to save the life of the woman or child, or (2) unless one or both of the parents of the unborn child agrees within 30 days of the birth to accept the parental rights and responsibilities for it if it survives the abortion, whenever an abortion of a potentially viable fetus results in a live birth the child shall be an abandoned ward of the state and the parents shall have no parental rights or obligations as if the parental rights had been terminated pursuant to Minnesota Statutes, Section 260.221. The child shall be provided for pursuant to Minnesota Statutes, Sections 256.12(14) and 256.72 to 256.87."

The plaintiffs argue that this section violates the guidelines of *Roe* in that it

ascribes fetal rights to the second trimester of pregnancy.

11. Section 4 of S.F.No.498 (Minn. Stat. § 145.414 (1974)) provides that no person or hospital or institution will be:

> "coerced, held liable or discriminated against in any manner because of a refusal to perform, accommodate, assist or submit to an abortion for any reason."

Plaintiffs contend that the words "and no hospital or institution" cannot constitutionally remain in this section as applying to public facilities. The defendants urge that this provision exists in order to afford protection to the individual and to the denominational hospital.

Plaintiffs attack the Regulations for the Termination of Pregnancy promulgated by the Minnesota State Board of Health, alleging the Regulations to be unconstitutional in their entirety. The plaintiffs' argument is based on the fact that the regulations are applicable to all facilities which perform abortions, including first trimester facilities, and constitute a comprehensive regulatory scheme for such facilities. The regulations, claim the defendants, operate only to establish reasonable health, safety and sanitation standards for facilities which exist primarily for the purpose of performing abortions and do not create an "extra layer" of regulation rejected by *Doe* and *Word*.

The "Church Amendment" to the Medical Facilities Construction and Modernization Amendments of 1970, P.L. 93–45, 87 Stat. 91, Tit. 4, § 401(b)(2)(A) is the last challenged provision. The Amendment provides that the receipt of federal money by an individual or "entity"

> "does not authorize any court or any public official or other public authority to require . . .
>
> "(2) such entity to—
>
> "(A) make its facilities available for the performance of any sterilization procedure or abortion if the perform-

ance of such procedure or abortion in such facilities is prohibited by the entity on the basis of religious beliefs or moral convictions. . . ."

The plaintiffs challenge the "Church Amendment" on the basis that it usurps the judicial function of defining "State Action" for Fourteenth Amendment purposes; that it allows a hospital receiving federal funds to disavow its public purpose by discriminating against a single medical procedure; and it interferes with the needs of physicians and patients, regardless of the medical needs of the latter.

United Hospitals, Inc., was formed through the merger of the Charles T. Miller and St. Lukes Hospitals in St. Paul, Minnesota, and through its president, Defendant Wallace, operates these two hospitals as divisions. United Hospitals, Inc., is a private organization which has received funds from the Hill-Burton program. Both of its divisions, subsequent to the Supreme Court decision of *Roe, supra,* and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), continued a pre-existing policy against elective abortions. In support of the Amendment's constitutionality, the defendants urge it is a valid exercise of constitutional power to protect the First Amendment rights of individuals and hospitals in their religious and moral beliefs.

## PENDING MOTION

We now reach the motion of Defendant William B. Wallace, as President of United Hospitals, Inc., for dismissal on the grounds that the Court lacks jurisdiction over the subject matter in that a private hospital's activities do not constitute "state action" within the purview of 42 U.S.C. § 1983. In considering the Wallace motion to dismiss, we do not reach the "state action" question because we find the plaintiffs have not pleaded nor proved facts from which this Court can find that the plaintiffs have standing to maintain their suit against Defendant Wallace.

"The question of standing in the federal court is to be considered in the framework of Article III which restricts the judicial power to 'cases' and 'controversies'. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The prerequisites of standing are a 'logical nexus between the status asserted and the claim sought to be adjudicated,' Flast v. Cohen, *supra*, 392 U.S. at 102, 88 S.Ct. 1942, and the necessary degree of contentiousness, Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)." Doe v. Poelker, 497 F.2d 1063 (8th Cir. 1974).

Plaintiffs have not met these requirements. The Court finds that United Hospitals, Inc., is a private hospital and at the time this action was brought none of the plaintiff doctors were members of the staff of United Hospitals, Inc. Plaintiff Moe made no effort to obtain an abortion in United Hospitals, Inc. This Court concludes in the absence of standing, it is without jurisdiction to consider plaintiffs' alleged cause of action against Defendant Wallace. There is no justiciable controversy existing between the plaintiffs and Defendant Wallace through which this Court could adjudicate the constitutionality of the Church Amendment.

The motion of Defendant Wallace to dismiss is granted.

## MERITS

The central issue to be decided is whether the newly enacted Minnesota Abortion Statutes and the Regulations promulgated by the State Board of Health are constitutionally permissible.

The Supreme Court in Roe v. Wade and Doe v. Bolton has clearly outlined the Constitutional limits of state legislative authority with respect to abortions. If the statutes and regulations here in issue are to stand, they must conform to the guidelines of *Roe* and *Doe*. In Roe v. Wade, the Court announced that a right of personal privacy exists in all people. This right at one time or another had its roots planted in the First, Fourth, Fifth, Ninth and Fourteenth Amendments. The Court in Roe found a woman's private right to terminate her pregnancy arose out of the Due Process Clause of the Fourteenth Amendment. At a given point this right to terminate must however be balanced against the state's interest in regulation.[3]

The point at which the state's interest in regulation overrides the woman's personal right, termed the "compelling point", was set out at 410 U.S. p. 164, 93 S.Ct. p. 732 in a tripart test. It is as follows:

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effecutation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the state, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability the State, in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment,

3. Roe v. Wade, *supra*, at 152–154, 93 S.Ct. 705, 35 L.Ed.2d 147.

for the preservation of the life or health of the mother.

From this test, it is clear that during the period of pregnancy prior to the end of the first trimester, the abortion decision must be absolutely left to the judgment of the woman and her physician. After the first trimester, but before fetal viability the state may regulate abortions only to the extent necessary to safeguard the woman's health.

After viability of the fetus occurs, the state's interest in regulation outweighs the woman's private right and it is only at this stage that the state may absolutely regulate the process of abortion.

■ Thus in drafting statutes regulating the abortion process, the state must consider the separate trimester test. Where the state fails to do so, the regulation is overbroad because it fails to balance the state's right against the woman's. Nyberg v. City of Virginia, 495 F.2d 1342 (8th Cir. 1974); Word v. Poelker, *supra*.

The statutes in question here proscribe abortions when the fetus becomes "potentially" viable except where necessary to preserve the life or health of the woman. Central to this restriction is the placement of the term "potentially viable" in the fetal development. Section 1, Subd. 2 of S.F.No.498 (Minn. Stat. § 145.411, Subd. 2) clearly states that viability occurs at the halfway point in gestation. It being universally accepted that normal human gestation is about 40 weeks, the Minnesota law gives the state the absolute power to regulate under part 3 of the *Roe* test at 20 weeks.

Defendants have presented no evidence which would persuade this Court that viability does in fact occur at 20 weeks. In its historical review of the abortion dilemma, the Supreme Court in *Roe* said:

"Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." 410 U.S. at 160, 93 S.Ct. at 730.

Even accepting the lesser of these figures, 24 weeks of pregnancy is still within the second trimester or that stage subsequent to the first trimester, but prior to viability. Using 24 weeks as the earliest point of viability places a decision to terminate pregnancy between 20 and 24 weeks in the second part of the *Roe* test. Thus at any point prior to 24 weeks and subsequent to approximately the end of the first trimester, the state may regulate only insofar as such regulations are related to maternal health.

We do not accept the suggestion of the defendants that the Supreme Court's comment on viability was only dicta. It appears to this Court that after reviewing the historical, medical, and legal attitude on abortions, the Supreme Court concluded that as between cases the point of viability will vary, and whether or not the fetus is in fact viable must be left to the medical judgment of the physician. In any event, under present technology, it does not arise prior to 24 weeks. It appears that the Court made its comments on viability to prevent the very thing that has happened here, which is the attempt to set viability by legislative definition and thereby, in effect, unreasonably interfere with what the Court has determined to be a fundamental right.

■■ Except in the context of its right to generally regulate professional standards relating to the practice of medicine, any attempt to regulate abortion prior to viability is unconstitutional unless the regulation is for the period after the approximate end of the first trimester and is reasonably related to the woman's health. The Minnesota definition of viability as found in § 145.411, Subd. 2 and § 145.413, Subd. 1 of the Minnesota Statutes is unreasonable and cannot stand.

■ It therefore follows that Section 2, Subd. 3(2) and 3(3) of § 145.412 are infirm. Both of these subdivisions place restrictions upon the attending physician during the *Roe* second stage which

are not reasonably necessary for maternal health. In addition, these subdivisions prescribe procedures which are unnecessary in view of the existing professional standards and state health regulations attendant to any medical practice. *Word, supra.*

 § 145.412, Subd. 4; § 145.412, Subd. 1(3) and § 145.416 as a whole subject the abortion decision to the rules promulgated by the State Board of Health. As stated before, during the first trimester of pregnancy the abortion decision and its implementation is solely within the realm of the pregnant woman and her doctor. In *Word*, the appellate court stated that

"[s]weeping regulation of the abortion procedure without regard for the conflicting interests involved will not withstand constitutional scrutiny." *Word*, 495 F.2d at 1351; Accord *Nyberg*, 495 F.2d at 1344–1348.

To the extent these regulations apply to any abortion performed in the first trimester, they are unconstitutional. The two provisions relating to informed consent (§ 145.412, Subd. 1(4) and § 145.412, Subd. 2) are objectionable in that they single out the abortion procedure and are simply unnecessary to protect either the woman's health or the health of the unborn. As the court in Doe v. Bolton stated:

"The statute's emphasis . . . is on the attending physician's 'best clinical judgment that an abortion is necessary' . . . If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies . . . It is still true today that '[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge on that respect, that he [the physician] possesses the requisite qualifications." citation omitted, 410 U.S. at 199, 93 S.Ct. at 751.

The decision to terminate a pregnancy if made prior to viability is one which must be left to the woman and her physician, except for the limited state involvement in the second stage. By leaving the decision to those intimately involved, the Supreme Court has placed first and second stage abortions in that realm of medical judgment attendant to any health or medical procedure. In the matter of consent, as dealt with in these two provisions, physicians and patients involved in a first or second stage abortion should not be held to any more stringent regulation than is normally placed on the practice of medicine. The abortion question in these stages must be resolved by the patient and by the physician based upon the exercise of his professional judgment. There is no reason to suspect he would do otherwise.

 § 145.415 providing for a procedure for the legal disposition of a fetus born alive is infirm in its use of the term "potentially viable" as defined in § 145.411. The statute as it ascribes human status to a live born viable fetus does not offend any standards of *Roe* or *Doe*. It is clear under existing law that once a fetus is born alive and is capable of living independently of its mother, with or without artificial aid, it becomes a person—protected by the usual constitutional rights. In its attempt to establish the point of viability by legislative determination, the statute as worded would take away from the physician his right to determine, in the exercise of his professional medical judgment under the technology and medical knowledge available to the profession, when a fetus is viable.

 The state "conscience clause" embodied in § 145.414 as applied to public institutions clothed with state action is unconstitutional and cannot stand. The practical effect of such a provision is to severely limit and restrict the availability of hospital facilities for abortions and is an encroachment upon the right of physicians to freely practice medicine.

**1018**

█ As stated before in *Nyberg, supra*, a public hospital's facilities must be available to those seeking abortions just as they are available to any other medical procedure requiring hospitalization. The abortion *decision* in the first and second stages of the *Roe* test must be left absolutely to the doctor and patient. State regulation of *procedures* in the second stage is allowed only if necessary to preserve the woman's health.

The provisions of § 145.414 are overbroad and invalid as applied to public hospitals whose facilities are sought for first or second stage abortions and constitute state interference of the kind prohibited by the Supreme Court in Roe v. Wade. With respect to § 145.414, we conclude the law as determined by the Eighth Circuit in *Nyberg, supra,* 495 F. 2d p. 1347, to be dispositive.

> "The hospital facilities must be made available for abortion services, as they are for other medical procedures, to those physicians and their patients who have a right to and request such facilities."

█ Finally, we reach the Regulations for Termination of Pregnancy. The regulations are completely without constitutional foundation insofar as they may be applied to facilities involved in administering to first trimester abortions. The words of *Roe* are unequivocal—"free of interference by the State". This must mean all interference of whatever form whether by statute or administrative regulation except, as previously set out herein, in the context of its right to generally regulate professional standards relating to the practice of medicine. The regulations as they might apply to that period after the end of the first trimester but before viability can have validity only insofar as they are reasonably related to maternal health.

The Court fails to see what purpose the myriad of rules and requirements serve beyond the already existing professional standards, state health and building statutes. A review of the regulations leads this Court to conclude that as a whole they cannot be said to reasonably relate to maternal health. On the contrary, they interfere with the right of the woman to secure an abortion free of state interference. The regulations themselves appear to require much which is normal clinical procedure.

Here the extra layer of protection placed upon abortions conducted in such facilities is not necessary nor is it reasonably related to any recognized state objective. It operates to single out clinics and professionals who perform abortions, and places upon them regulations so involved and complex as to stifle the formation and operation of any such facilities, and chill the abortion decision making process.

Accordingly, the Regulations for the Termination of Pregnancy as adopted by the Minnesota State Board of Health on January 10, 1974, are unconstitutional in their entirety.

Based on the above, it is hereby ordered that judgment will be entered declaring:

1. Minnesota Statute § 145.411, subdivision 2, unconstitutional;
2. Minnesota Statute § 145.412, subdivision 3(2), unconstitutional;
3. Minnesota Statute § 145.412, subdivision 3(3), unconstitutional;
4. Minnesota Statute § 145.413, subdivision 1, unconstitutional insofar as it makes use of the term "potentially viable";
5. Minnesota Statute § 145.411, subdivision 4, unconstitutional;
6. Minnesota Statute § 145.412, subdivision 1(3), unconstitutional;
7. Minnesota Statute § 145.416, unconstitutional;
8. Minnesota Statute § 145.412, subdivision 1(4), unconstitutional;
9. Minnesota Statute § 145.412, subdivision 2, unconstitutional;
10. Minnesota Statute § 145.415, unconstitutional;

11. Minnesota Statute § 145.414, unconstitutional insofar as it relates to public hospitals or institutions;

12. The Regulations for Termination of Pregnancy unconstitutional.

Injunctive relief is denied, as we assume the Minnesota authorities will give credence to this decision.

It is ordered that the preliminary injunction will expire ipso facto upon the expiration of the appeal period, or in the event an appeal is taken upon the final determination of the appeal.

APPENDIX A

ABORTIONS

CHAPTER 177

S.F.No.498

[Coded]

"Section 1.

145.411 Regulation of abortions; definitions

Subdivision 1. Terms. As used in sections 145.411 to 145.416, the terms defined in this section have the meaning given to them.

Subd. 2. Viable. 'Viable' means able to live outside the womb even though artificial aid may be required. During the second half of its gestation period a fetus shall be considered potentially 'viable'.

Subd. 3. Hospital. 'Hospital' means an institution licensed by the state board of health; adequately and properly staffed and equipped; providing services, facilities and beds for the reception and care of one or more nonrelated persons for a continuous period longer than 24 hours for diagnosis, treatment or care of illness, injury or pregnancy; and regularly providing clinical laboratory services, diagnostic x-ray, services and treatment facilities for surgery, obstetrical care or other definitive medical treatment of similar extent. 'Hospital' shall not include diagnostic or treatment centers, physicians' offices or clinics, or other facilities for the foster care of children licensed by the commissioner of welfare.

Subd. 4. Abortion facility. 'Abortion facility' means those places properly recognized and licensed by the state board of health under lawful rules and regulations promulgated by the board for the performance of abortions.

Subd. 5. Abortion. 'Abortion' includes an act, procedure or use of any instrument, medicine or drug which is supplied or prescribed for or administered to a pregnant woman which results in the termination of pregnancy.

Sec. 2.

145.412 Criminal acts.

Subdivision 1. It shall be unlawful to wilfully perform an abortion unless the abortion is performed:

(1) by a physician licensed to practice medicine pursuant to Minnesota Statutes, Chapter 147, or a physician in training under the supervision of a licensed physician;

(2) in a hospital or abortion facility if the abortion is performed after the first trimester;

(3) in a manner consistent with the lawful rules and regulations promulgated by the state board of health; and

(4) with the consent of the woman submitting to the abortion after a full explanation of the procedure and effect of the abortion.

Subd. 2. It shall be unlawful to perform an abortion upon a woman who is unconscious except if the woman has been rendered unconscious for the purpose of having an abortion or if the abortion is necessary to save the life of the woman.

Subd. 3. It shall be unlawful to perform an abortion when the fetus is potentially viable unless:

(1) the abortion is performed in a hospital;

(2) the attending physician certifies in writing that in his best medical judgment the abortion is necessary to pre-

serve the life or health of the pregnant woman; and

(3) to the extent consistent with sound medical practice the abortion is performed under circumstances which will reasonably assure the live birth and survival of the fetus.

Subd. 4. A person who performs an abortion in violation of this section is guilty of a felony.

Sec. 3.

145.413 Recording and reporting health data

Subdivision 1. The state board of health shall promulgate regulations to effect a reporting system on terminated pregnancies in order that statistical data is obtained that will relate to maternal health. The regulations and reporting system shall not interfere with the right of a pregnant woman to seek an abortion before the fetus is potentially viable. No such report, or any part thereof, shall be disclosed, in any manner, by any official or clerk or other employee or person having access thereto, and all such information shall be confidential.

Subd. 2. If any woman who has had an abortion dies from any cause within 30 days of the abortion or from any cause potentially related to the abortion within 90 days of the abortion, that fact shall be reported to the state board of health.

Subd. 3. A physician who performs an abortion and who fails to comply with subdivision 1 and transmit the required information to the state board of health within 30 days after the abortion is guilty of a misdemeanor.

Sec. 4

145.414 Abortion not mandatory

No person and no hospital or institution shall be coerced, held liable or discriminated against in any manner because of a refusal to perform, accommodate, assist or submit to an abortion for any reason.

Sec. 5

145.415 Live fetus after abortion, treatment

Subdivision 1. A potentially viable fetus which is live born following an attempted abortion shall be fully recognized as a human person under the law.

Subd. 2. If an abortion of a potentially viable fetus results in a live birth, the responsible medical personnel shall take all reasonable measures, in keeping with good medical practice, to preserve the life and health of the live born person.

Subd. 3. (1) Unless the abortion is performed to save the life of the woman or child, or, (2) unless one or both of the parents of the unborn child agrees within 30 days of the birth to accept the parental rights and responsibilities for the child if it survives the abortion, whenever an abortion of a potentially viable fetus results in a live birth, the child shall be an abandoned ward of the state and the parents shall have no parental rights or obligations as if the parental rights had been terminated pursuant to Minnesota Statutes, Section 260.-221. The child shall be provided for pursuant to Minnesota Statutes, Sections 256.12(14) and 256.72 to 256.87.

Sec. 6

145.416 Licensing and regulation of facilities

The state board of health shall license and promulgate regulations for facilities as defined in section 145.411, subdivision 4, which are organized for purposes of delivering abortion services.

Sec. 7 Minnesota Statutes, Sections 617.18 and 617.19 are repealed.

Sec. 8 This act is effective the day following its final enactment.

Approved March 21, 1974."

## APPENDIX B

## REGULATIONS FOR THE TERMINATION OF PREGNANCY

### Chapter One: Policy Statement

MHD 271: (a) Foreword

The Minnesota State Board of Health has both legal and professional responsi-

bilities for protecting, promoting, and improving the health of the citizens of Minnesota. In the absence of enforceable legislation to control pregnancy termination procedures, other than the provision that such procedures must be performed by a licensed physician, the Board has assumed the responsibility to develop regulations for the purpose of safeguarding the health, safety and well-being of women contemplating termination of pregnancy. These regulations relate primarily to the persons and ambulatory facilities involved in providing pregnancy termination procedures and specify various requirements relating to the facility, service, program record-keeping and reporting. They do not predetermine the results of professional judgment as to the wisdom and propriety of the service, which must remain the province of the physician and the woman seeking the procedure as in all professional-patient decisions.

(b) Authority of Adoption of Regulations

These regulations are adopted under the authority of Minnesota Statutes § 144.12 which states "that the Board may adopt, alter, and enforce reasonable regulations of permanent application . . . the preservation of the public health."

(c) Use and Accessibility of Regulations

A copy of these regulations shall be kept available for reference on the premises of all ambulatory facilities as defined herein. Employees shall be fully informed and instructed with reference to these regulations in order to ensure strict compliance with the requirements herein set forth.

(d) Severability

If any provision of these regulations are found to be unconstitutional and void, the remaining provisions of the regulations shall remain valid, unless the court finds the valid provisions of the regulations are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume that the Board would have promulgated the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the Board's intent.

### Chapter Two: Definitions

MHD 272: The following words, terms, and phrases, for the purposes of these regulations, shall have the meanings indicated below unless the language or context clearly indicates that a different meaning is intended.

(a) *"Termination of pregnancy," "pregnancy termination,"* or *"termination procedure,"* shall mean administering to a woman any medicine, drug, substance, or thing whatever, or the employment upon her of any instrument or other means whatever, with intent to induce or procure the miscarriage of such a woman.

(b) The term *"abortion"* is not used in these regulations, since it also applies to spontaneous early terminations of pregnancy. These regulations do not apply to spontaneous abortions.

(c) *"First trimester of pregnancy"* shall mean the time period from the first day of the last normal menstrual period through the completion of 14 weeks (98 days) of gestation.

(d) *"Second trimester of pregnancy"* shall mean the period of pregnancy from the beginning of the fifteenth week through the twenty-eighth completed week (99 to 196 days) of gestation.

(e) *"Third trimester of pregnancy"* shall mean the period of pregnancy from the beginning of the twenty-ninth week through the forty-second completed week (197 to 294 days) of gestation.

(f) *"Ambulatory facility"* shall mean any institution, place or building, or part thereof, including hospital outpatient services, devoted primarily to, as determined by the Department, the maintenance and operation of facilities for the performance of procedures designed to terminate a pregnancy on an outpatient basis irrespective of whether

the entire structure is devoted primarily to this purpose.

(g) *"Affiliated ambulatory facility"* shall mean an ambulatory facility, other than a hospital, which is located within a total transport time of ten minutes from a hospital with which such facility has a written affiliation agreement for the treatment of its patients requiring care on an emergency and inpatient basis.

(h) *"Unaffiliated ambulatory facility"* shall mean an ambulatory facility, other than a hospital, which does not have an affiliation agreement with a hospital.

(i) *"Hospital"* shall mean a hospital licensed pursuant to Minnesota Statutes, Sections 144.50 to 144.58 inclusive.

(j) *"Physician"* shall mean a person licensed to practice medicine pursuant to Minnesota Statutes, Chapter 147. The term shall include doctors of osteopathy who are licensed to practice medicine and surgery.

(k) *"Board"* shall mean the Minnesota State Board of Health.

(l) *"Department"* shall mean the Minnesota Department of Health.

## Chapter Three: Authorization to Operate an Ambulatory Facility

MHD 273: Application Process

(a) Application for authority to establish and maintain an ambulatory facility in the State of Minnesota shall be made in writing and submitted on form(s) provided by the Department. No ambulatory facility shall commence operation prior to submitting such application to the Department and the granting of such authorization by the Board; provided, however, that ambulatory facilities which are operating as of the effective date of these regulations shall submit such application within 90 days from the effective date of these regulations or 90 days from the time forms are made available by the Department.

(b) Each person, partnership, business association, or other business association which operates and maintains more than one ambulatory facility shall submit a separate application for each such facility.

(c) The application shall contain, but not be limited to, the following information:

(1) the name of the ambulatory facility and its address

(2) the name of the administrator and medical director

(3) a statement specifying whether the ambulatory facility has a written affiliation agreement with a hospital, with a copy thereof

(4) a statement of the facility's policies and procedures for emergency care which includes arrangements for emergency transportation and for physician services at the hospital

(5) if the applicant is a corporation, a copy of the Articles of Incorporation and By-Laws and any amendments thereto shall be provided the Department

(d) Upon review of the application, the Board is authorized to request of the applicant more information if deemed appropriate.

(e) No authorization shall be granted until all final inspections and clearances pertinent to applicable regulations have been complied with.

## Chapter Four: Ambulatory Facility Procedures

MHD 274: Facilities

(a) Each ambulatory facility authorized to perform pregnancy terminations on an ambulatory basis shall meet the following requirements:

(1) Discharge Policy

Such facility shall not provide accommodations for the overnight stay of patients. Individual patients shall be discharged when appropriate with respect to their continued well-being or shall be transferred to a hospital.

(2) Admission and Examination Facilities

An ambulatory facility shall have separate waiting, dressing, examination procedure, and recovery rooms for the registration, counseling, and medical evaluation, examination, and treatment of patients. Said rooms shall be of sufficient number and size so as to adequately accommodate the average daily caseload. At a minimum this requires that suitable furnishing be provided so that patients and persons accompanying patients need not stand. Said rooms shall be constructed so that the privacy of patients will be assured and their physical comfort, safety, health, and convenience provided for. Nothing contained herein shall prohibit registration, interviewing, history-taking, medical examination, and appropriate referral from being conducted in an examining physician's office.

(3) Procedure Room

Any room in which a pregnancy termination is performed shall be referred to herein as the procedure room. It shall be adequately equipped, supplied, and staffed. The procedure room and its equipment shall be constructed and maintained so as to be free from health, sanitary, and safety hazards. Environmental controls shall be maintained to prevent infection which shall include the control of personnel and patient traffic in the area of the procedure room, staff dressing room, and scrub-up facility. In addition, the following shall be provided for:

(aa) emergency equipment necessary to stabilize the woman's condition during transfer to a hospital

(bb) staff dressing rooms and scrub-up facilities which shall be suitably located in close proximity to the procedure room so as to prevent contamination while moving therefrom to the procedure room and shall include a scrub sink, soap dispenser, and brushes

(cc) a utility room which shall be equipped with facilities for sterilization of supplies, except when sterile supplies are received from a central supply service

(dd) an adequate supply of drugs, plasma expanders, and parenteral fluids which shall be available at all times with appropriate refrigeration equipment therefore.

(4) Recovery Room

An adequately sized recovery room or rooms separate from but in close proximity to the procedure rooms shall be provided.

(aa) Such room shall be continuously staffed while in use by qualified nursing personnel as specified in MHD 276(c)(2) until patients are discharged.

(bb) An adequate number of recovery beds and rooms shall be provided to insure an adequate length of recovery time as determined by the physician for the recovery of each patient. No pregnancy termination procedure shall be commenced if all recovery beds are being utilized.

(5) Laboratory Facilities

(aa) The pregnancy termination facility shall be equipped with a clinical laboratory which can perform the following tests: pregnancy testing, urinalysis, hematocrit or hemoglobin and other hematological tests including determination of blood group and Rh type.

(bb) The examination of surgically removed tissue, and infrequently performed tests, or those requiring specialized equipment and skill, may be forwarded to another laboratory.

(6) Elevators

Any building of more than one story in height and in which a termination facility or any part thereof is located above the ground floor shall have an elevator for the use of patients. The elevator shall be of sufficient size to accommodate a standard stretcher and two attendants.

(7) Transportation

The facility shall have arrangements for emergency transportation to a hospital in the event of an emergency. One qualified person as specified in MHD 276(b) or (c) shall be designated to ac-

company the patient, in addition to the driver.

(8) Records

Space and equipment shall be provided to permit the production, storage, and retrieval of records and so situated as to assure the confidentiality of such records. Records shall be maintained for three years.

(9) Emergency Telephone

An emergency telephone service shall be available to all patients on a 24-hour-a-day basis. The service shall include the ability to contact a physician so that appropriate advice and instructions can be given pertaining to the receipt of emergency treatment. See MHD 275(d)(5)(cc).

(b) Affiliated Ambulatory Facilities

(1) Affiliated ambulatory facilities shall have, in addition to the requirements of MHD 274(a)(1) through (9), a written statement of agreement or affiliation with a hospital. The agreement shall state at a minimum that the hospital will make available emergency services for the care of the ambulatory facility patients who may develop acute problems and may require immediate hospital treatment. Such services shall be available for use within 15 minutes notice and shall include but not be limited to the following: a physician available to provide emergency services; full surgical capability including anesthesia, blood bank, clinical laboratory, and diagnostic radiological services.

(2) The hospital with which affiliation is desired shall be no longer than ten (10) minutes by ambulance or other transportation means from the facility. The ten (10) minutes shall be determined under average traffic conditions as experienced during the hours that the facility is treating patients.

(c) Unaffiliated Ambulatory Facilities

Unaffiliated ambulatory facilities shall have, in addition to the requirements of MHD 274(a)(1) through (9), anesthesia and resuscitation equipment

and such other equipment as is necessary to treat hemorrhage, shock, and other surgical emergencies as well as an adequate supply of, or arrangements for the emergency furnishing of blood and blood derivatives.

(d) Compliance with these regulations

Compliance with some of the regulations can be judged only on a case-by-case basis. In case it is determined that the regulation has not been complied with, the Department will list its reasons for such determination.

MHD 275: Program Requirements

(a) Admission Procedures

(1) Counseling Services

Counseling shall be offered and made available on the premises. Social services and psychological consultation shall be offered and made available either on the premises or through referral.

(2) Referrals

Where a referral is made from a private physician's office, hospital, clinic or other pregnancy termination service, appropriately written policies and procedures for accepting referral from the above sources shall be established by the administrator. The sharing of fees between the referral source and the ambulatory facility shall be prohibited.

(b) Examination Procedures

Prior to the performance of a termination procedure, the following procedures shall be administered and documented in the patient's medical record. (Medical evaluation and examination records from the referral source may be utilized when appropriate):

(1) a pertinent medical history and physical examination, including a pelvic examination. Special attention shall be given to the identification and evaluation of any complicating medical, surgical or emotional condition requiring special attention.

(2) pregnancy test result and the estimated duration of the pregnancy

(3) serological determination of Rh factor

(4) hemoglobin or hematocrit determinations

(5) urinalysis

(6) white blood count and differential, when indicated

(7) gonorrheal culture

(8) a cervical cytologic smear, when indicated

(c) Operative Requirements

(1) Procedures

Pregnancy termination procedures shall be performed in ambulatory facilities only on those patients whose condition is, in the judgment of the physician, not complicated by significant medical problems.

(2) Inpatient Pregnancy Terminations

Pregnancy terminations requiring inpatient care shall be performed in hospitals only.

(3) Second or Third Trimester Pregnancies

Pregnancy terminations which are in the second or third trimester of pregnancy shall be performed only in hospitals.

(4) Third Trimester Justification

Termination of pregnancy during the third trimester of pregnancy is prohibited except where it is necessary, in the appropriate medical judgment, for the preservation of the life or health of the mother.

(5) Physician Requirement

Pursuant to Minn.Laws 1973, ch. 547, all termination procedures shall be performed by a physician.

(6) Anesthesia

Where appropriate, as determined by the operating physician, an anesthesiologist, or a physician anesthetist, or a nurse anesthetist under the supervision of a physician anesthetist, shall administer anesthesia. Local anesthesia, including para-cervical block, may be administered by the operating physician.

(d) Post-Operative Requirements

(1) Observation During Recovery

All patients having a pregnancy termination procedure shall be continuously observed by qualified nursing personnel as specified in MHD 276(c)(2) in a recovery room after the performance of the procedure until it has been determined that the patient's condition has stabilized. Nursing observations shall be recorded in the patient's record.

(2) Rh Negative Therapy

When indicated, anti-Rh immune globulin shall be available for each Rh negative patient. Patient refusal to accept such therapy shall appear in the patient's medical record along with the patient's signature on a release form.

(3) Examination of Tissue

All specimens of tissue removed in the termination procedure shall be submitted to a pathologist for examination. See MHD 281(a).

(4) Contraceptive Services

Each authorized termination facility shall offer to every patient a selection of contraceptive services directly or by referral.

(5) Written Instructions

Upon discharge from the termination facility, each patient shall be provided with written instructions which shall include at a minimum the following:

(aa) symptoms of complications to be looked for

(bb) instruction pertaining to resuming normal activities

(cc) specific emergency telephone numbers available 24 hours a day to be used by the patient should any complication occur or question arise. See MHD 274(a)(9).

(dd) instructions for follow-up or return visit for the purposes of a physical examination, advice on contraception, and counseling services, when indicated.

MHD 276: Personnel

(a) Administrator

A person shall be designated as responsible for the management, control, operation, record-keeping, reports, and compliance with these regulations.

(b) Medical Director

(1) A medical director, who shall be a physician, shall be responsible for the establishment, implementation and supervision of all medical policies, procedures and services of the facility.

(2) The medical director shall designate a physician or physicians whom he/she deems qualified to directly supervise and provide the care of all patients undergoing a termination procedure, including their post-operative care and follow-up.

(c) Nursing

(1) At least one currently licensed, registered nurse shall be designated and responsible for:

(aa) developing and implementing written nursing policies and procedures

(bb) supervising and directing the nursing personnel and services

(cc) assuring that there is a registered nurse on duty at all times while services are being provided

(2) Registered nurses, licensed practical nurses, nursing students, and other ancillary personnel assigned to give nursing care in an ambulatory facility shall be adequately trained in observational and emergency techniques for pre-operative and post-operative care of termination patients.

(d) Counselors

(1) Counselors shall have training and/or experience to meet the needs of the facility's patients.

(2) When specialized counseling is required, specialists outside of the facility may be utilized.

MHD 277–280. Reserved for future use.

*Chapter Five: Records and Reporting*
MHD 281: Internal Records of the Ambulatory Facility

(a) Patient Records

The pregnancy termination facility shall keep records of each patient undergoing a pregnancy termination procedure which shall include admission and discharge notes, a signed consent form, pertinent medical history, results of tests and examinations, termination procedure report, pathology report, report of after-care, counseling records, results of follow-up contact, and other progress notes.

(b) Complications

All surgery-related or anesthesia-related complications which result in morbidity or death of a patient shall be recorded in detail in the patient's medical record.

(c) Confidentiality

Each facility shall maintain and ensure confidentiality of individual patient records.

MHD 282: Reports to the Board

(a) Statistical Reports

Each ambulatory facility shall submit a written compilation of statistical data quarterly to the Board on such forms and in such manner as the Board may prescribe.

(b) Reporting Terminations

An ambulatory facility shall report all pregnancy terminations performed by its staff as follows:

(1) By the 10th of each month all pregnancy terminations performed in the ambulatory facility during the preceding month shall be reported on forms prescribed by the Board which shall include but not be limited to the following items:

| | |
|---|---|
| Patient's city, county and state of residency | Facility Name<br>Facility Address |
| Census Tract for City of Minneapolis and City of St. Paul | Number of Previous Induced Pregnancy Terminations of Patient |
| Patient or Chart No. | |
| Age | Estimate of Gestational Age |
| Race | |
| Marital Status | Date of Pregnancy Termination |
| Number of Living Children | |
| | Type of Termination Procedure |

(2) All surgery-related or anesthesia-related complications which result in morbidity or death of a patient shall be reported in writing to the Board within 15 days from the notification to the am-

bulatory facility of the morbidity or death of the patient.

(3) The Board shall ensure and maintain confidentiality of an individual pregnancy termination records.

MHD 283 and 284: Reserved for future use.

### Chapter Six: Inspections

MHD 285: Every institution, place or building, or part thereof for which authorization to establish and maintain a pregnancy termination facility has been granted by the Board shall be periodically inspected by a duly appointed representative of the Board under the rules and regulations contained herein.

The duly appointed representative of the Board shall have access to the records in the facility for purposes of assuring compliance with these regulations.

MHD 286: Reserved for future use.

### Chapter Seven: Modification by the Board

MHD 287:

(a) When the strict applicability of any provision of these regulations presents practical difficulties or unusual hardships, the Board, in a specific instance, may modify the application of such provision consistent with the general purpose of these regulations and upon such conditions as are necessary, in the opinion of the Board to protect the health, safety, and general well-being of women contemplating termination of pregnancy.

(b) The ambulatory facility shall state the specific exceptions requested plus explain in detail the reasons for such request. Whether or not the requests are granted, the Board shall state in detail the reasons for its decision.

### Chapter Eight: Failure to Comply with Regulations

MHD 288: Denial, suspension, or Revocation of Authorization

(a) Grounds for denial, suspension, or revocation of authorization

The Board may refuse to authorize, or to renew or may suspend or revoke the authorization of a pregnancy termination facility for any of the following reasons:

(1) Violation of any provision of these regulations

(2) Furnishing false or misleading information to the Board or Department

(3) Failure to furnish information requested

(4) Furnishing false, misleading or fraudulent information regarding the pregnancy termination facility to the public, or

(5) Conduct of practices detrimental to the health and welfare of the patients seen and treated in an ambulatory facility

(b) Hearing Procedure

When the Board determines that allegations are sufficient to justify the initiation of a contested case to determine whether the authority granted through these regulations to operate an ambulatory facility should be denied, suspended, or revoked, the following procedures shall be adhered to:

(1) The Board, through its Secretary and Executive Officer, shall serve upon the ambulatory facility in question a written notice specifying the complaint against the facility.

(2) The Secretary and Executive Officer shall appoint a hearing officer who shall hear the case for the Board, conduct a prehearing conference, if appropriate, perform any and all duties in connection with the hearing process, and make a recommended findings of fact.

(3) A hearing shall be held upon at least a thirty (30) day written notice.

(4) The decision of the Board shall be based on the testimony and records.

(5) Any action taken under this section shall comply with the provisions of Minnestoa Statutes, Chapter 15, the Minnesota Administrative Procedure Act.

**(c) Authorization Reconsidered**

If the authorization to operate is denied, suspended or revoked as herein provided, a new application for authorization may be considered by the Board if, when, and after the conditions upon which the aforesaid action was based have been corrected, evidence of this fact has been satisfactorily furnished to the Board, and all other conditions of the Board's Order complied with.

MHD 289–290: Reserved for future use.