Jane E. HODGSON, M.D., et al., Appellees,

v.

Warren LAWSON, Commissioner of Health of the State Department of Health and Executive Secretary of the State Board of Health; and Warren Spannaus, Attorney General of the State of Minnesota, Appellants.

No. 74–1569.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1975.

Decided Oct. 6, 1976.

Peter W. Sipkins, St. Paul, Minn., for appellants; Warren R. Spannaus, Atty. Gen., Peter W. Sipkins, Sol. Gen. and Thomas H. Jensen, Sp. Asst. Atty. Gen., St. Paul, Minn., on brief.

Roy Lucas, Washington, D.C., for appellees; Maynard E. Pirsig and Gary B. Crawford, Minneapolis, Minn., on brief.

Randall D. B. Tigue, Legal Counsel, Minn. Civil Liberties Union, Minneapolis, Minn., for amicus curiae, Minn. Civil Liberties Union.

Before HEANEY and STEPHENSON, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

PER CURIAM.

This appeal concerns the constitutionality of certain provisions of the Minnesota abortion law, Minn.Stat. §§ 145.411–145.416 (1974), and the regulations promulgated thereunder by the Minnesota State Board of Health. On March 21, 1974, the Minnesota abortion law, passed in response to the decisions of the Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), was signed into law. Four days later, this action seeking declaratory and injunctive relief was brought in federal District Court by five physicians and a woman allegedly seeking an abortion.

All the challenged provisions and regulations were held unconstitutional by a three-judge court convened pursuant to 28 U.S.C. §§ 2281 and 2284. *Hodgson v. Anderson,* 378 F.Supp. 1008 (1974), *appeal dismissed for want of juris. sub nom., Spannaus v. Hodgson,* 420 U.S. 903, 95 S.Ct. 819, 42 L.Ed.2d 832 (1975). The appellants then filed a notice of appeal with the Supreme Court and a precautionary appeal with this Court. The Supreme Court held it was without jurisdiction to hear the direct appeal so proceedings resumed in this Court. Because of the similarity of many of the issues raised here with those raised in *Planned Parenthood of Central Missouri v. Danforth,* we have awaited the decision of the Supreme Court in that case. —— U.S. ——, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). With that decision now before us, we affirm in part and reverse in part.

In *Roe,* the Supreme Court concluded that the fundamental right of privacy, whether rooted in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action or the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. *Roe v. Wade, supra,* 410 U.S. at 153, 93 S.Ct. 705. The woman's right is not absolute; rather at some point in pregnancy, a state's interest in safeguarding health, maintaining medical standards and protecting potential life "become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." *Id.* at 154, 93 S.Ct. at 727. In *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at —— – ——, 96 S.Ct. at 2837, the Court restated the conclusion of *Roe:*

> [T]he permissibility of state regulation was to be viewed in three stages: "For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician," without interference from the State. The participation by the attending physician in the abortion decision, and his responsibility in that decision, thus, were emphasized. After the first stage, as so described, the State may, if it chooses, reasonably regulate the abortion procedure to preserve and protect maternal health. Finally, for the stage subsequent to viability, a point purposefully left flexible for professional determination, and dependent upon developing medical skill and technical ability, the State may regulate an abortion to protect the life of the fetus and even may proscribe abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. (Citations and footnote omitted.)

In light of the mandate of the Supreme Court, we will now consider the challenged provisions of the abortion statutes and regulations.

A. *The definition of viability.* After reviewing the medical, legal and philosophical historical attitudes towards abortions, the Court in *Roe* stated:

> Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks.

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

*Roe v. Wade, supra,* 410 U.S. at 160, 93 S.Ct. at 730.

■ However, a statutory definition need not place viability at a specific point in the gestation period. A definition of viability in terms of potential ability to survive outside the womb, albeit with artificial aid, was found to be sufficient in *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at ——, 96 S.Ct. 2831.[1]

■ The Minnesota abortion law, however, goes a step further and incorporates the concept of "potential viability" into the definition of viability:

'Viable' means able to live outside the womb even though artificial aid may be required. During the second half of its gestation period a fetus shall be considered potentially 'viable'.

Minn.Stat. § 145.411, subd. 2.

The District Court reasoned that including the term "potentially viable" in the definition of "viable" had the effect of establishing a presumption that viability occurred at the end of the twentieth week. It held that this was inconsistent with the Supreme Court decisions in *Roe v. Wade, supra,* and *Doe v. Bolton, supra,* which place the earliest point of viability at the twenty-fourth week. In support of its position, it cited an absence of evidence to support the state's determination that viability occurs at twenty weeks, and the fact that the decision as to whether or not a particular fetus is viable must be left to the medical judgment of the physician because the point of viability will vary from case to case. *Hodgson v. Anderson, supra* at 1016. This holding was cited with approval by the Supreme Court in *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at —— n.5, 96 S.Ct. 2831, and cannot be disturbed by us. Had "viable" been defined simply as "ability to live outside the womb even though artificial aid may be required" and had the word "viable" instead of the

term "potentially viable" been used in the operative sections of the Minnesota abortion law, then the offending sections of the statute, Minn.Stat. §§ 145.411, subd. 2, 145.-412, subd. 3(2) and (3), and 145.415, could have been sustained under *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at ——, 96 S.Ct. 2831.

■ B. *Regulation of abortion procedure.* Several of the challenged provisions of the Minnesota abortion law were found by the District Court to incorporate by reference the impermissible definition of viability and, therefore, unconstitutionally restrict the availability of abortions during the second trimester. Under *Roe,* the state may only regulate the abortion procedure to the extent it preserves and protects maternal health during the second trimester of pregnancy. *Roe v. Wade, supra,* 410 U.S. at 163, 93 S.Ct. 705.

Minn.Stat. § 145.412, subd. 3, provides that:

It shall be unlawful to perform an abortion when the fetus is potentially viable unless:

(1) the abortion is performed in a hospital;

(2) the attending physician certifies in writing that in his best medical judgment the abortion is necessary to preserve the life or health of the pregnant woman; and

(3) to the extent consistent with sound medical practice the abortion is performed under circumstances which will reasonably assure the live birth and survival of the fetus.

The requirement of § 145.412, subd. 3(1), that an abortion be performed in a hospital, which is not challenged here, is an example of permissible state regulation subsequent to the first trimester. *Id.* However, § 145.412, subd. 3(2), proscribing the abortion of a potentially viable fetus unless necessary to preserve the life or health of

---

1. This, notwithstanding the fact that a definition of viability which is not couched in terms of gestational age but rather depends upon a case-by-case *preoperative* determination, places great responsibility on the attending physician and may, because of the inherent uncertainty of such medical judgments, have the effect of inhibiting the performance of abortions. *See Doe v. Zimmerman,* 405 F.Supp. 534, 539 (M.D.Pa.1975).

the mother, and § 145.412, subd. 3(3), requiring, in the abortion of a potentially viable fetus, the use of methods which will reasonably assure the fetus's survival, impose restrictions which are not necessarily related to maternal health. As the District Court held, such restrictions are impermissible under *Roe* during the second trimester of pregnancy and, thus, Minn.Stat. § 145.-412, subd. 3(2) & 3(3), is unconstitutional.

The phrase "potentially viable," impermissibly defined in terms of the twentieth week of gestation, also plays an integral role in Minn.Stat. § 145.415, which provides:

> Subd. 1. A potentially viable fetus which is live born following an attempted abortion shall be fully recognized as a human person under the law.

> Subd. 2. If an abortion of a potentially viable fetus results in a live birth, the responsible medical personnel shall take all reasonable measures, in keeping with good medical practice, to preserve the life and health of the live born person.

> Subd. 3. (1) Unless the abortion is performed to save the life of the woman or child, or (2) unless one or both of the parents of the unborn child agrees within 30 days of the birth to accept the parental rights and responsibilities for the child if it survives the abortion, whenever an abortion of a potentially viable fetus results in a live birth, the child shall be an abandoned ward of the state and the parents shall have no parental rights or obligations * * *.

By incorporating the term "potentially viable" in subdivisions 1 and 2, the statute has the practical effect of requiring a physician performing an abortion after the twentieth week to exercise the prescribed standard of care and use only those procedures and techniques calculated to preserve the life and health of the fetus.

█ Under *Roe,* the state may protect fetal life subsequent to viability. *Id.* It may, consistent with *Danforth,* require a professional preoperative determination of viability in each case upon which the physician must proceed accordingly. *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at —— – ——, 96 S.Ct. 2831. The state cannot, however, enact legislation which has the effect of establishing a presumption of viability prior to the twenty-fourth week as the point of viability before that time is to be "purposefully left flexible for professional determination." *Id.* at ——, 96 S.Ct. at 2837. We, thus, have no alternative but to find Minn. Stat. § 145.415, subd. 1 & 2, unconstitutional in light of *Roe* and *Danforth.* Because of its use of "potentially viable," we also hold that Minn.Stat. § 145.415, subd. 3, is unconstitutional.[2]

C. *The woman's consent.* The Minnesota abortion law contains two consent requirements: § 145.412, subd. 1(4), provides it will be unlawful to perform an abortion without first obtaining the consent of the woman after a full explanation of the abortion procedure and its effect; and § 145.-412, subd. 2, provides that:

> It shall be unlawful to perform an abortion upon a woman who is unconscious except if the woman has been rendered unconscious for the purpose of having an abortion or if the abortion is necessary to save [her] life * * *.

The District Court found the consent provisions to be

> objectionable in that they single out the abortion procedure and are simply unnec-

---

**2.** The constitutionality of Minn.Stat. § 145.415, subd. 3, providing for the termination of parental rights if an abortion results in a live birth, is also highly questionable for reasons not advanced by the appellees here. *See Roe v. Rampton,* 366 F.Supp. 189, 193 (C.D.Utah 1973), where a similar statutory provision was struck down because it provided for termination of parental rights without due process of law. The physician-appellees here, as in

*Planned Parenthood of Central Missouri v. Danforth,* —— U.S. ——, —— n.2, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), would not have standing to challenge subd. 3 because they cannot claim any injury in fact. Appellee Marjory Moe, a pregnant woman allegedly seeking an abortion at the time the action was brought, might well be found to have standing had the issue been raised.

essary to protect either the woman's health or the health of the unborn.

*Hodgson v. Anderson, supra* at 1017.

■ In *Danforth*, the Court upheld an informed consent requirement similar to Minn.Stat. § 145.412, subd. 1(4), and its attendant criminal penalty, saying:

> Despite the fact that apparently no other Missouri statute * * * requires a patient's prior written consent to a surgical procedure, the imposition * * * of such a requirement for termination of pregnancy even during the first stage, in our view, is not in itself an unconstitutional requirement. The decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and its consequences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent.

*Planned Parenthood of Central Missouri v. Danforth, supra* —— U.S. at ——, 96 S.Ct. at 2840 (footnote omitted).

We believe that the particularly stressful nature of the decision to abort distinguishes it sufficiently from other medical decisions to justify additional state regulation insuring that the woman's consent has been freely and intelligently given. *Word v. Poelker*, 495 F.2d 1349 (8th Cir. 1974), is not to the contrary. There, in striking down a city ordinance regulating the operation of abortion clinics, we held only that where no need for additional regulation is shown, the abortion procedure may not be regulated more restrictively than other medical operations of similar danger and complexity. *Id.* at 1351. Accordingly, we reverse the District Court and uphold the constitutionality of § 145.412, subd. 1(4).

■ We are unable, however, to extend the *Danforth* rationale to uphold Minn.Stat. § 145.412, subd. 2. This provision would subject a physician to felony charges if he aborted a woman, even during the first trimester, who was anesthetized for a different procedure but who had instructed the physician to perform an abortion should a specified contingency arise. As stated before, the abortion decision and its implementation is to be left to the woman and her physician during the first trimester. *Roe v. Wade, supra*, 410 U.S. at 163–164, 93 S.Ct. 705. Thus, we affirm the District Court and find Minn.Stat. § 145.412, subd. 2, unconstitutional as it impermissibly prohibits contingent consent during the first trimester.

■ D. *Institutional conscience clause.* Minn.Stat. § 145.414 provides:

> No person and no hospital or institution shall be coerced, held liable or discriminated against in any manner because of a refusal to perform, accommodate, assist or submit to an abortion for any reason.

The appellees contend that the words "and no hospital or institution" cannot, as applied to public facilities, constitutionally remain in this section. The District Court agreed, holding this provision invalid insofar as it related to public hospitals or institutions. *Hodgson v. Anderson, supra* at 1018. In *Nyberg v. City of Virginia*, 495 F.2d 1342 (8th Cir.), *appeal dismissed*, 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974), this Court clearly held that a public hospital[3] must make its existing facilities available for the performance of abortions. We adhere to that decision and affirm the judgment of the District Court.

---

**3.** The receipt of public funds under the Hill-Burton Act of 1946, or other federal or state programs, does not in and of itself change the character of a private institution so that it becomes a public institution obligated to make its facilities available for the performance of abortions. *Briscoe v. Bock et al., etc.*, 540 F.2d 392 (8th Cir. 1976); *Watkins v. Mercy Medical Center*, 520 F.2d 894 (9th Cir. 1975); *Greco v. Orange Memorial Hospital Corporation*, 513 F.2d 873 (5th Cir.), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975); *Doe v. Bellin Memorial Hospital*, 479 F.2d 756 (7th Cir. 1973); *Ward v. St. Anthony Hospital*, 476 F.2d 671 (10th Cir. 1973). *Contra, Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638 (4th Cir. 1975).

E. *Recordkeeping.* Minn.Stat. § 145.413, subd. 1, requires the reporting, in accordance with regulations to be promulgated by the state board of health, of all abortions performed after the fetus is potentially viable. The appellees object to the use of the term "potentially viable," citing its derivation from Minn.Stat. § 145.411, subd. 2, where viability is determined to occur at the twentieth week of gestation. The District Court held that the use of the term "potentially viable" in Minn.Stat. § 145.413, subd. 1, rendered that subdivision unconstitutional, in that it authorized previability abortion regulation unrelated to maternal health. *Hodgson v. Anderson, supra* at 1016.

We reverse on the basis of the recent Supreme Court decision in *Planned Parenthood of Missouri v. Danforth, supra.* The Court stated:

[r]ecordkeeping of this kind, if not abused or overdone, can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment.

*Id.,* —— U.S. at —— – ——, 96 S.Ct. at 2846 (footnote omitted).

Recordkeeping and reporting requirements that are so directed to the preservation of maternal health and which respect a patient's confidence and privacy, as these do here, are permissible *regardless* of the stage of pregnancy. *Id.* at ——, 96 S.Ct. 2831.

F. *Regulations.* The appellees challenge Minn.Stat. §§ 145.411, subd. 4,[4] 145.-412, subd. 1(3),[5] and 145.416 [6] which read together subject the abortion decision, even during the first trimester, to regulations promulgated by the state board of health.

The District Court found these provisions to be unconstitutional to the extent they are applied to the first trimester abortions. *Hodgson v. Anderson, supra* at 1017. We disagree.

In *Connecticut v. Menillo,* 423 U.S. 9, 10–11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975), the Court stated:

*Roe* teaches that a State cannot restrict a decision by a woman, with the advice of her physician, to terminate her pregnancy during the first trimester because neither its interest in maternal health nor its interest in the potential life of the fetus is sufficiently great at that stage. But the insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion being as safe for the woman as normal childbirth at term, and that predicate holds true only if the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman.

Thus, the state has the power to insure that the first trimester abortions, like other medical procedures, are performed under conditions providing for the maximum safety of the patient. Statutory provisions which merely authorize the adoption of regulations, albeit during the first trimester, are not unconstitutional. *See Planned Parenthood Association v. Fitzpatrick,* 401 F.Supp. 554, 576 (E.D.Pa.1975). Accordingly, we reverse the finding of the District Court as to the unconstitutionality of the following enabling provisions: Minn.Stat. §§ 145.411, subd. 4; 145.412, subd. 1(3); and 145.416.

Any regulations promulgated under such enabling statutes must, of course, comply with the requirements of the

---

4. Minn.Stat. § 145.411, subd. 4, provides:
 *Abortion facility.* 'Abortion facility' means those places properly recognized and licensed by the state board of health under lawful rules and regulations promulgated by the board for the performance of abortions.

5. Minn.Stat. § 145.412, subd. 1(3), provides:
 It shall be unlawful to wilfully perform an abortion unless the abortion is performed:
 \* \* \* \* \* \*

in a manner consistent with the lawful rules and regulations promulgated by the state board of health[.]

6. Minn.Stat. § 145.416 provides:
 The state board of health shall license and promulgate regulations for facilities as defined in section 145.411, subdivision 4, which are organized for purposes of delivering abortion services.

Supreme Court.[7] A state can impose the same regulations on a clinic, specifically built to perform abortions during the first trimester, that are imposed on other clinics that perform surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions. As long as the regulations applying to abortion clinics are the same as those applied to other clinics performing similar surgical procedures, it would not be impermissible to make them specifically applicable to abortion clinics. Where the state regulates abortions beyond its regulation of similar surgical procedures, that difference in treatment must be shown to be necessitated by the particular characteristics of the abortion procedure. *See Word v. Poelker, supra* at 1351–1352. Here, the District Court found that the "Regulations for the Termination of Pregnancy," promulgated by the state board of health,[8] are an "extra layer of protection placed upon abortions" which serve no purpose "beyond the already existing professional standards, state health and building statutes." *Hodgson v. Anderson, supra* at 1018.

 We think, however, because of the decision of the Supreme Court in *Danforth* and because the state has subsequently promulgated regulations governing "Freestanding Outpatient Surgical Centers,"[9] that the parties ought to be given the op-

portunity to present evidence with respect to the extent to which the abortion regulations are consistent with those governing the performance of surgical procedures requiring the same degree of skill and care.[10] Accordingly, we remand the question of the constitutionality of the "Regulations for the Termination of Pregnancy" to the District Court.

In summary, we hereby:

Affirm the finding of the District Court that Minn.Stat. § 145.411, subd. 2, is unconstitutional;

Affirm the finding of the District Court that Minn.Stat. § 145.412, subd. 3(2) & (3), is unconstitutional;

Affirm the finding of the District Court that Minn.Stat. § 145.415 is unconstitutional;

Reverse the finding of the District Court that Minn.Stat. § 145.412, subd. 1(4), is unconstitutional;

Affirm the finding of the District Court that Minn.Stat. § 145.412, subd. 2, is unconstitutional;

Affirm the finding of the District Court that Minn.Stat. § 145.414 is unconstitutional insofar as it applies to public hospitals or institutions properly defined;

Reverse the finding of the District Court that Minn.Stat. § 145.413 is unconstitutional;

7. Several abortion regulations which apply to the first trimester of pregnancy, as do the regulations challenged here, have been declared unconstitutional. *Arnold v. Sendak,* 416 F.Supp. 22 (S.D.Ind.1976); *Word v. Poelker,* 495 F.2d 1349 (8th Cir. 1974); *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *Hallmark Clinic v. North Carolina Department of Human Resources,* 380 F.Supp. 1153 (E.D.N.C.1974); *aff'd per curiam,* 519 F.2d 1315 (4th Cir. 1975); *Coe v. Gerstein,* 376 F.Supp. 695 (S.D.Fla. 1973), *appeal dismissed,* 417 U.S. 279, 94 S.Ct. 2246, 41 L.Ed.2d 68 (1974).

8. At the public hearing held by the state department of health with respect to the proposed regulation, the following individuals and organizations indicated their general support for the regulations as being consistent with the need to preserve maternal health: Commis-

sioner of Health, City of Minneapolis; Minnesota Hospital Association; East Range Clinics, Ltd., Virginia, Minnesota; State Medical Association; Medical Advisory Committee, Planned Parenthood of Minnesota; St. Louis County Health Department; Mesabi Chapter of MORAL; Duluth Chapter, Abortion Rights Council of Minnesota; Unitarian Universal Women's Federation; Minnesota Women's Political Caucus; Meadowbrook Womans Clinic; Religious Coalition for Abortion Rights.

9. Minn.Reg. MHD 411–425, filed June 30, 1975.

10. During oral argument before the three-judge court, the state indicated that it was in the process of drafting regulations which will cover extra hospital surgery. When enacted, they will supercede the regulations relating solely to abortion and there will then be general regulations which apply to all ambulatory facilities.

Reverse the finding of the District Court that Minn.Stat. §§ 145.411, subd. 4; 145.412, subd. 1(3); and 145.416 are unconstitutional; and

Remand the question of the constitutionality of the "Regulations for the Termination of Pregnancy" to the District Court.

HEANEY, Circuit Judge (dissenting).

The Supreme Court's decisions in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), were premised on the concept that a decision to abort would be made in the traditional doctor-patient setting. There was not to be abortion on demand;[1] rather, the abortion decision was to be made only after the doctor and the patient had carefully reviewed the physical, emotional, psychological and familial factors relevant to this extremely important and stressful decision.[2]

The realities are altogether different. It is estimated that more than half of the nearly one million abortions performed in 1975 took place in non-hospital clinics,[3] under circumstances where the doctor performing the operation often sees the patient once and then only for a brief period.[4] The result is that we do have abortion on demand, and the decisions of the doctor and patient to abort are not being made with the same degree of care and thoughtfulness that accompanies other surgical procedures.

In light of these circumstances, I cannot concur in the decision of this Court to declare unconstitutional § 145.415, subds. 1 and 2, nor can I concur in the decision insofar as it denies the state the power to enact and enforce reasonable rules and regulations with respect to first trimester abortions.

In my judgment, we can, consistent with the decisions of the Supreme Court, and in keeping with our duty to interpret legislation, if possible, in a manner which favors its survival,[5] declare unconstitutional only that portion of Minn.Stat. § 145.411, subd. 2, which states:

1. *See Roe v. Wade,* 410 U.S. 113, 153–154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton,* 410 U.S. 179, 189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). *Accord, Planned Parenthood of Central Missouri v. Danforth,* —— U.S. ——, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976).

2. *Doe v. Bolton, supra,* 410 U.S. at 192, 93 S.Ct. 739. *See also Roe v. Wade, supra,* 410 U.S. at 153, 163, 93 S.Ct. 705. Medical literature outlines a role for the attending physician in the abortion-decision making process which is no less demanding. *See, e. g.,* Butler and Fujita, *Abortion Screening and Counseling: A Brief Guide for Physicians,* 50 Postgraduate Medicine, Oct. 1971, at 208; Margolis, *Some Thoughts on Medical Evaluation and Counseling of Applicants for Abortion,* 14 Clinical Obstetrics and Gynecology 1255 (1971); West and Walsh, *The Need for Pre-Abortion Counseling—Now More than Ever,* 59 Nebraska Medical Journal 34 (1974).

3. According to a nationwide survey of health institutions and physicians conducted by the Alan Guttmacher Institute, legal abortion is now one of the most frequently performed surgical procedures. The number of abortions reported for 1974 (899,850) is twenty-one percent greater than for 1973 (742,460), while the projected total for 1975 (998,020) represents an increase of eleven percent over 1974. Weinstock, Tietze, Jaffe and Dryfoos, *Abortion Need and Services in the United States, 1974–1975,* 8 Family Planning Perspectives, March/April 1976, at 58–59.

The increase in the number of abortions performed from 1973 through 1975 is paralleled by a sharp rise in the number of abortions reported by non-hospital clinics. Whereas in the first quarter of 1973, non-hospital clinics accounted for forty-two percent of reported abortions, this figure had increased to fifty-five percent by the first quarter of 1975. *Id.* at 66. Furthermore, abortion services are highly concentrated among comparatively few large volume providers (mostly non-hospital clinics) in relatively few metropolitan areas. During the first quarter of 1975, seven percent of all providers (thirty-one private hospitals, eight public hospitals and ninety-eight non-hospital clinics) performed fifty-two percent of all reported legal abortions. *Id.* at 67.

4. *See, e. g.,* Marcin and Marcin, *The Physician's Decision-Making Role in Abortion Cases,* 1975 The Jurist 66 (1975); Klaus, *A Medical Cop-Out?,* 133 America 68 (1975).

5. *See Ex Parte Endo,* 323 U.S. 283, 299, 65 S.Ct. 208, 89 L.Ed. 243 (1944); *McMahon v. City of Dubuque, Iowa,* 255 F.2d 154, 160 (8th Cir.), *cert. denied,* 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958).

During the second half of its gestation period a fetus shall be considered potentially 'viable'.

By treating the statute in this manner, the first provision in the same subdivision, defining viability as the ability "to live outside the womb even though artificial aid may be required," will remain in effect. Such a definition of viability is clearly permissible. A statutory definition need not place viability, which is essentially a medical concept, at a specific point in the gestation period, *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at ——, 96 S.Ct. 2831; a definition in terms of potential ability to survive outside the womb, albeit with artificial aid, is sufficient. *Id.* at —— —— ——, 96 S.Ct. 2831.

We can also sustain the validity of § 145.-415, subds. 1 and 2. In my judgment, these subdivisions only require a physician to exercise reasonable care to sustain the life of a fetus that is liveborn. This leaves the decision, as to the measures to be taken, to the judgment of the attending physician and that is where the Supreme Court has indicated the decision belongs. I am cognizant of the fact that sustaining the statute might result in a few physicians using procedures to effect an abortion that would insure a stillborn fetus. I cannot believe, however, that the number would be significant. On the other hand, the statute would serve to alert physicians to a special responsibility in those cases where there is doubt as to the length of the pregnancy and the viability of the fetus.

I also continue to adhere to my dissent in *Nyberg v. City of Virginia,* 495 F.2d 1342 (8th Cir.) (Gibson & Heaney, JJ., dissenting from denial of petition for rehearing en banc), 419 U.S. 891 (1974). Therefore, I dissent from the affirmance of the District Court's finding that Minn.Stat. § 145.414 is unconstitutional as it applies to public hospitals and institutions. In my view, public hospitals and institutions should not be compelled to perform abortions until it has been determined that the right of a pregnant woman to have an abortion cannot otherwise be reasonably protected.

I concur in the decision of the majority to remand the question of the constitutionality of the regulations to the District Court. I would go a step further, however, and hold that the need for counseling services is so immediate and so great,[6] and the constitutionality so apparent,[7] that the following regulation with respect to counseling should be sustained without further action by the District Court:

MHD 275: Program Requirements

 (a) Admission Procedures

 (1) Counseling Services

Counseling shall be offered and made available on the premises. Social services and psychological consultation shall be offered and made available either on the premises or through referral.

Minn.Reg. MHD–275.

The regulation follows the "Guidelines for the Performance of Abortions" adopted by the Minnesota State Medical Association in May, 1973. The guidelines, which were

---

**6.** Counseling is an integral part of abortion services. The manner in which referral and counseling are carried out plays a major role in determining whether the abortion patient is treated in a safe, humane, and dignified manner, and protected against exploitation. American Public Health Association, *Recommended Standards for Abortion Services,* 61 Am.J.Pub.Health 396 (1971). *See also* McLaughlin, *Abortion Standards, New York City Board of Health,* 14 Clin.Obstet. & Gynecol. 25, 31 (1971); Margolis, *supra* at note 2; Butler and Fujita, *supra* at note 2; West and Walsh, *supra* at note 2; Gedan, *Abortion Counseling With Adolescents,* 74 Am.J.Nursing 1856

(1974); Asher, *Abortion Counseling,* 62 Am.J. Pub.Health 686 (1972).

**7.** In *Planned Parenthood of Central Missouri v. Danforth, supra,* —— U.S. at ——, 96 S.Ct. 2831, the Supreme Court recognized that the particularly stressful nature of the decision to abort distinguishes it sufficiently from other medical procedures to justify a state regulation requiring a written consent during the first trimester. It follows, I believe, that a state requirement for counseling, before the written consent is given, is valid. It is only by careful counseling that there can be assurance that the woman's consent has been freely and intelligently given.

received as an exhibit at the District Court hearing, provided:

### COUNSELING SERVICES

Physicians should make counseling services an integral component of their abortion programs. Counseling services should be readily available to all women seeking abortion services. Each abortion service shall provide abortion counseling if desired by the woman, as well as a referral to clergy, social services or other appropriate mental health services when needed. Three basic principles of abortion counseling are that:

1. Specialized professional consultation, such as psychiatric, social service, psychological, religious, etc., should be available, not mandatory.

2. Be supportive and non-judgmental regardless of the circumstances of the pregnancy.

3. That it be an educational experience.

The aims of abortion counseling are:

1. To aid the woman in making a decision about her pregnancy.

2. To help her implement the decision.

3. To assist her in controlling her future fertility.

The manner in which counseling is carried out plays a major role in determining whether the woman is protected against exploitation and is treated in a safe, humane, and dignified manner. The following standards are recommended to accomplish this:

1. Non-judgmental and supportive explanation of all alternatives available including social, medical, and financial assistance where available.

2. Counseling should serve, when appropriate, to simplify and expedite the provision of abortion services. It should not impose unnecessary medical risk by delaying the obtaining of these services.

3. Specialized professional consultation, such as psychiatric, social service, psychological, religious, etc., should be available, but not mandatory.

4. Preventive measures including contraception and/or sterilization, with specific plans for followup should be discussed with each woman.

Factors to consider in counseling:

1. Pregnancy termination may be part of the problem, not just the solution. The fact that a woman has become pregnant may be a *symptom of underlying psychological conflicts.* Opportunities should be available for further counseling.

2. Physicians are encouraged to acquire counseling techniques. (Emphasis included.)