## WOMEN'S MEDICAL CENTER OF PROVIDENCE, INC.

v.

**Joseph E. CANNON, M.D., M.P.H. as Director of the Department of Health of the State of Rhode Island and Mary Ellen McCabe, as Chief Counsel and Legal Advisor to the Department of Health of the State of Rhode Island.**

Civ. A. No. 78–496.

United States District Court,
D. Rhode Island.

Dec. 18, 1978.

Deming E. Sherman, of Edwards & Angell, Providence, R. I., for plaintiff.

Mary Ellen McCabe, Chief Counsel R. I. Dept. of Health, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This is an action seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202. Jurisdiction is premised upon 28 U.S.C. §§ 1331(a) and 1343(3). Plaintiff is a Rhode Island business corporation which, prior to April 27, 1978, operated a medical clinic at 100 Highland Avenue, Providence, Rhode Island, for gynecological services, including the termination of pregnancies during the first trimester. Plaintiff challenges the validity of a provision of the Rules and Regulations for the Termination of Pregnancy issued by the Department of Health of the State of Rhode Island. Defendants are the Director of the Department of Health, charged with enforcing these regulations, and the department's legal advisor, who has the power to prosecute violations of the regulations pursuant to R.I.G.L. §§ 23–1–25 (1968 Reenactment) and 23–1.2–6 and 7 (1976).

The court held a hearing on September 26 and again on December 4 on plaintiff's motion for a preliminary injunction. Following the second hearing, the parties agreed that these hearings should be treated as a trial on the merits. Consequently, plain-

tiff's motion for a preliminary injunction is consolidated with the trial on the merits, Fed.R.Civ.P. 65(a)(2). This opinion, based on those two hearings and additional facts submitted to the Court by stipulation, constitutes the decision of the Court on the merits of the case.

Women's Medical Center (WMC) began operations in November, 1977. Its staff of eight persons consisted of an administrator, a receptionist, a secretary, two registered nurses, a licensed practical nurse, an aid, a counselor, and a physician. WMC's services consisted primarily of first trimester terminations, routine gynecological care, birth control counseling, and free pregnancy tests. Most of these services were on a fee basis, with a $155 charge for terminations and a fee between $10–25 for routine gynecological care. However, for every ten persons referred from certain legitimate referring sources such as Planned Parenthood or a university health service who paid a full fee, WMC offered that source one case free.[1] Additionally, persons with Medicaid cards where charged only $125 and sometimes less for terminations.

During this time WMC's physician was Dr. Ata O. Mehrtash. Dr. Mehrtash was licensed to practice medicine in Rhode Island and Massachusetts, is Board certified in obstetrics and gynecology, and had staff privileges for normal obstetrics and assisting in gynecological surgery at Hahnemann Hospital in Worcester, Massachusetts. He also had taught for five years at Columbia Medical School and had prior experience in performing terminations on an out-patient basis at abortion clinics. He was employed by WMC as an independent contractor on a fee per service basis, with no ownership interest. Dr. Mehrtash was present on Wednesdays and Saturdays to perform terminations and other gynecological services, although WMC itself was open six days a week. Dr. Mehrtash was not admitted to the staff of any hospitals in Rhode Island. Dr. Mehrtash did apply for staff privileges

at a minimum of three local hospitals, but for reasons that are unclear was unable to gain acceptance to the staff of these hospitals.[2] Dr. Mehrtash's competence to perform first trimester abortions safely has not been questioned.

WMC had an oral agreement with Women and Infants Hospital in Providence for emergency transfer of their patients should such action be necessary. WMC also had a written agreement with an ambulance service to effect such transfers.

During the two months preceding April 27, 1978, WMC performed approximately 12–15 terminations a week. In addition, it provided gynecological services for an additional 15–25 patients per week, although sometimes as many as 30–40 patients were treated. Pregnancy testing, gynecological examination, counseling and termination were all performed at the first visit. A follow-up visit one to two weeks later was scheduled at no additional charge.

On April 27, 1978, the defendant Dr. Cannon, Director of the Department of Health, issued an immediate compliance order to WMC ordering cessation of pregnancy termination procedures. The basis for this order was WMC's failure to comply with two sections of the Rules and Regulations for the Termination of Pregnancy issued by the Department of Health. WMC immediately ceased termination procedures, but continued providing gynecological services for approximately two more weeks, at which time it closed entirely because it could not economically remain open. Termination procedures had previously supplied 95% of WMC's revenue.

The regulations which WMC was violating were:

> 602.3.6  All tissue removed shall be submitted for pathological examination and the report included in the patient record.

---

1. This credit could be applied to reduce the price to several individuals or to provide one person a procedure without any fee at all.

2. The parties stipulated that Dr. Mehrtash was not admitted but that the reasons for non-admission were unknown.

602.4.1 All termination procedures shall be performed by a physician licensed under the provisions of Chapters 5–36 or 5–37 of the General Laws of Rhode Island of 1956, as amended. The physician shall have unsupervised obstetrical, gynecological, or general surgical privileges in an accessible licensed hospital.

WMC has been willing and able to comply with § 602.3.6 at all times since April 27. WMC has been unable to comply with § 602.4.1. As already noted, Dr. Mehrtash was unable to obtain staff privileges at an "accessible licensed hospital." WMC has been unable to obtain the services of a doctor with such privileges in spite of what its Director, Malcolm Polis, described as a guarantee of a thousand dollars a week for a three day week. Consequently, WMC remains closed.

Three other facilities exist in the State of Rhode Island offering first trimester termination services. The Free Choice Medical Center, located at 169 Weybosset Street in Providence, is run by a private corporation owned in part by its director and sole doctor, Dinesh Vadher. Dr. Vadher had unlimited OB/GYN privileges prior to opening the clinic at Women & Infants and Rhode Island Hospitals and has continued these privileges. Free Choice provides services similar to those of WMC at roughly equivalent prices.

Planned Parenthood of Rhode Island, 187 Westminster Street, Providence is a non-profit clinic with seven doctors, all of whom have staff privileges at local hospitals. It provides the same services as WMC, but requires 3–5 visits rather than the maximum of two at WMC. It charges a maximum fee of $170 for termination procedures.

The Ambulatory Surgical Unit of Women and Infants Hospital, a non-profit voluntary hospital at 50 Maude Street, Providence, also performs termination procedures. It requires three visits and charges a maximum of $215. All four of its doctors have OB/GYN privileges and had such prior to association.

Consequently, at the present time the only place at which a woman can obtain a first trimester termination of pregnancy on the first visit is the Free Choice clinic, located in downtown Providence.

The challenged regulation, § 602.4.1, is part of a comprehensive set of "Rules and Regulations for the Termination of Pregnancy" issued by the Department of Health in December, 1973, shortly after the United States Supreme Court's decisions in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). These regulations govern all termination procedures, whether performed by hospitals, free-standing clinics, or physicians in their offices. They set forth a series of requirements for first trimester terminations regarding methodology, facilities, program requirements, and personnel. They do not purport to interfere with the decision to terminate.

Dr. Alex M. Burgess, Jr., formerly Chief of the Division of Medical Standards of the Rhode Island Department of Health and responsible in that capacity for the drafting and ultimate promulgation of these regulations,[3] testified as to why the Department of Health enacted a regulation requiring doctors performing first trimester pregnancy terminations to have unsupervised obstetrical, gynecological or general surgical privileges at an accessible licensed hospital. Essentially there were two reasons. Most important was assuring continuity of care in emergency, life-threatening circumstances. Dr. Burgess testified that it is important that a physician be able to follow the patient into the hospital, to know the admitting, emergency room, and operating room routines and to be working in familiar surroundings in order to deal with an emergency to his or her full capacity. However, Dr. Burgess also admitted that the desirability of assuring continuity of care was no different in emergencies arising out of first trimester terminations than in emergencies

---

**3.** Dr. Burgess is currently Chief of the Office of Data Evaluation of the Department of Health.

arising out of any other operation that might be performed outside the hospital but which is not subject to a similar regulation. Nonetheless, Dr. Burgess characterized this justification as "number one among the reasons" for adopting § 602.4.1.

Dr. Burgess also testified that because the history of abortion procedures prior to *Roe v. Wade, supra,* was one of informal backroom procedures and illegality, the Department of Health concluded that if the low risk attendant to first trimester abortions in properly performed circumstances was to prevail, it would have to depend on regulations which insured "high quality service and the avoidance of informal, backstreet, backroom procedures." Dr. Burgess admitted that other procedures of equal or greater complexity or risk, such as obstetrics, tonsillectomies, and minor surgeries, were not subject to the same type of regulation. Consequently, it was primarily because the unavailability of legal abortions prior to 1973 had led to the administration of high risk procedures by incompetent individuals, both laymen and physicians, that a regulation restricting the performance of abortions to physicians with unsupervised hospital privileges was drafted. In other words, first trimester abortions were singled out for special regulation because of the history of high risk backroom procedures prior to its legalization, not because the procedure itself was one which required a physician with unsupervised hospital privileges.

Rhode Island has several other types of free-standing clinics. Only two of these are subject to regulations by the Department of Health at the present: Ambulatory Care Facilities[4] and Dialysis Facilities for Renal Disease.[5] Regulations for both these types of facility require doctors with hospital privileges.[6] Facilities not subject to any regulation include "Ambulatory Surgical Centers," which perform minor surgery, some with local anesthesia; "Emergency Rooms" which perform emergency medical care, some minor surgeries such as abscess and cyst removals, suturing, and, at least in one instance, vasectomies; and a variety of "clinics" or "health centers" which provide various services such as obstetrics, gynecological care, pediatrics, geriatrics, podiatry, dental care, dermatology, minor surgeries such as removal of growths and ingrown toenails, and application of local anesthesia. The minor forms of surgery performed by these facilities may also be performed by private physicians in their offices without special regulation.

Plaintiff challenges the requirement that a physician performing first trimester abortions have unsupervised privileges at an accessible hospital on two grounds: (1) that § 602.4.1 violates equal protection by regulating first trimester abortions differently than similar medical procedures, and (2) that it violates due process by improperly delegating legislative power to a private body without adequate legislative standards or safeguards against arbitrary or self-motivated action by the private body. Because the Court finds that § 602.4.1 violates equal protection, it does not reach the due process claim.

In *Roe v. Wade, supra,* the United States Supreme Court held that the right of a woman to decide to terminate a pregnancy and to effectuate that decision is a funda-

---

4.  "Ambulatory Care Facility" is defined as

    [A] place maintained, conducted, or operated by a health care corporation and devoted primarily to the provision of diagnostic, therapeutic, or preventative service for two (2) or more individuals unrelated by blood or marriage for not more than twenty-four (24) successive hours.

    R.I.G.L. § 23–16–2(i) (1976).

    The only facility fulfilling this status in Rhode Island is the Rhode Island Group Health Association, located in Providence with a branch in Warwick.

5.  Two such facilities located outside hospitals exist in Rhode Island: the Rhode Island Renal Institute in Warwick and the Artificial Kidney Center in East Providence.

6.  Rules and Regulations for Ambulatory Care Facilities, Rhode Island Department of Health, § 301.2.3 (November 1973); Rules and Regulations for Dialysis Facilities for Renal Disease, Rhode Island Department of Health, § 404.3.3 (September 1972).

mental right requiring a compelling rationale to justify state regulation. As a framework for deciding what a compelling rationale is, it stated:

> With respect to the State's important and legitimate interest in the health of the mother, the "compelling" point, in the light of present medical knowledge, is at approximately the end of the first trimester. This is so because of the now-established medical fact, referred to above at 149, that until the end of the first trimester mortality in abortion may be less than mortality in normal childbirth. It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.
>
> This means, on the other hand, that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State. *Id.* at 163, 93 S.Ct. at 731.

In the companion decision of *Doe v. Bolton, supra,* the United States Supreme Court struck down a requirement that all abortions, including those in the first tri-

mester, be performed only in a hospital. The impact of these two decisions is clear; the state may not interfere with the decision to terminate a pregnancy in the first trimester or the effectuation of that decision, either by specific proscription or undue restriction without medical justification. However, these decisions did not specifically rule out all regulation of first trimester abortions. Consequently, numerous courts have been faced with challenges to state regulations of first trimester abortions, especially regulations aimed at clinics such as WMC. While requirements that a physician perform the procedure have been upheld, *Connecticut v. Menillo,* 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975), many other regulations have been invalidated. This has been especially true when, as here, the regulations treated abortion differently from other medical procedures of similar complexity and risk.[7]

In *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975), the Court struck down a comprehensive set of regulations governing abortions, including a requirement that the doctor performing the abortion have special qualifications. The Court was particularly persuaded by the fact that abortion procedures were singled out for special regulation:

> Given the Supreme Court's acceptance of the medical fact that the mortality rate of women receiving legal abortions is "as low as or lower than the rates for normal childbirth," *Roe, supra,* 410 U.S. at 419, 93 S.Ct. at 725, there would seem to be little justification for more extensive governmental regulations, purportedly based on health considerations, for one procedure than the other. *Doe v. Hale Hospital,* 500 F.2d 144 (1st Cir. 1974).

---

7. *See Hodgson v. Lawson,* 542 F.2d 1350 (8th Cir. 1976); *Friendship Medical Center v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974) *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *Word v. Poelker,* 495 F.2d 1349 (8th Cir. 1974); *Mahoning Women's Center v. Hunter,* 444 F.Supp. 12 (N.D.Ohio 1977); *Abortion Coalition of Michigan, Inc. v.* *Michigan Department of Public Health,* 426 F.Supp. 471 (E.D.Mich.1977); *Mobile Women's Medical Center, Inc. v. Board of Commissioners of the City of Mobile,* 426 F.Supp. 331 (S.D.Ala. 1977); *Hallmark Clinic v. North Carolina Department of Human Resources,* 380 F.Supp. 1153 (E.D.N.C.1974).

The Chicago Board of Health's Rules on Abortion Services regulate comprehensively physicians who perform abortions, while at the same time leaving other medical procedures, often much more complex and dangerous in terms of the patient's health, up to the good judgment of the physician.

. . . . .

We have determined that given the "fundamental right" status of a woman to terminate her pregnancy during the first trimester, that in no circumstances could we allow to stand regulations, purporting to promote maternal health, that are more expansive than regulations that are applied to other medical procedures of the same risk and complexity.

505 F.2d at 1152–53.

This principle, that a state may regulate first trimester abortions to the extent that it regulates other surgical procedures requiring similar skill and care, was also stated by the Eighth Circuit in *Hodgson v. Lawson,* 542 F.2d 1350 (8th Cir. 1976):

A state can impose the same regulations on a clinic, specifically built to perform abortions during the first trimester, that are imposed on other clinics that perform surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions. As long as the regulations applying to abortion clinics are the same as those applied to other clinics performing similar surgical procedures, it would not be impermissible to make them specifically applicable to abortion clinics. Where the state regulates abortions beyond its regulation of similar surgical procedures, that difference in treatment must be shown to be necessitated by the particular characteristics of the abortion procedure. *See Word v. Poelker, supra* at 1351–1352. Here, the District Court found that the "Regulations for the Termination of Pregnancy," promulgated by the state board of health, are an "extra layer of protection placed upon abortions" which serve no purpose "beyond the already existing professional standards, state health and building statutes." *Hodgson v. Anderson* [378 F.Supp. 1008] *supra* at 1018.

542 F.2d at 1358.

The First Circuit utilized the same rationale in *Doe v. Hale Hospital,* 500 F.2d 144 (1st Cir. 1974), to require a public hospital to make elective abortions available on the same basis as medically indistinguishable procedures. Although *Hale Hospital* involved the policy of a public hospital, and not regulations affecting generally all physicians performing first trimester abortions, the Court sees no reason to apply a different rule in the latter case. *See also Hathaway v. Worcester City Hospital,* 475 F.2d 701 (1st Cir. 1973)(compelling rationale needed to justify public hospital treating sterilization procedures differently from other procedures of comparable risk).[8]

**8.** Some courts have apparently interpreted the language of *Roe v. Wade, supra,* as preventing any regulation by the state of first trimester abortions, even if that regulation was generally applicable to similar medical procedures. *See e. g., Baird v. Department of Public Health of the Commonwealth of Massachusetts,* C.A.No. 73–3869-MA (D.Mass. October 5, 1978); *Emma G. v. Edwards,* 434 F.Supp. 1048 (E.D. La.1977); *Arnold v. Sendak,* 416 F.Supp. 22 (S.D.Ind.) (three-judge court), *aff'd mem.* 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976). This interpretation seems to ignore the language of the United States Supreme Court in *Connecticut v. Menillo, supra,* that

[T]he insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion's being as safe for the woman as normal childbirth at term, and that predicate holds true only if the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman. See [*Roe v. Wade* ] 410 U.S. at 149–50, 163, 93 S.Ct. 705.

423 U.S. at 11, 96 S.Ct. at 171.

This language would seem to indicate that reasonable regulations generally applicable to similar medical procedures constitutionally may be applied to first trimester abortion procedures. *See also Sendak v. Arnold,* 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976) (White, J., dissenting).

This Court finds that the narrower reading of *Roe v. Wade, supra,* and *Doe v. Bolton, supra,* as forbidding only regulation which applies peculiarly to first trimester abortions or which unduly burdens the right to obtain such abortions, is more persuasive. *See, e. g., Hodgson*

The Court finds the principle enunciated by these cases applies equally to the present case. There is no question that first trimester abortion has been singled out for special treatment by the Department of Health's regulations. This is evident in the testimony of Dr. Burgess that the regulations were adopted specifically to regulate the performance of first trimester abortions following the removal of state power to regulate the decision to abort by *Roe v. Wade, supra.* It is also evident by the fact that numerous other procedures, such as tonsillectomy, hemorrhoidectomy, obstetrics, oral surgery, vasectomy, removal of skin lesions, repair of lacerations, removal of abscesses, and other minor surgeries, which are all procedures of similar or greater medical complexity and risk, are not subject to the requirement that the doctor performing them have unsupervised hospital privileges. The numerous "Ambulatory Surgical Centers," "Emergency Rooms," and miscellaneous "health centers" which exist in Rhode Island and perform such procedures as just delineated are likewise subject to no special regulation. Only "Dialysis Facilities for Renal Disease" and "Ambulatory Care Facilities" are subject to similar regulation. Furthermore, physicians in their private offices are not subject to regulation of this type in performing any medical procedure except abortion and dialysis. He or she can perform any other medical procedure according to his or her own moral view, even if he or she has been dropped from a hospital's staff as not worthy of staff privileges.

Defendants' proffered justifications for this disparate treatment are inadequate. What Dr. Burgess characterized as the principal justification for the challenged regulation, continuity of care in emergency situations, is, as Dr. Burgess admitted, equally applicable to any emergency, yet similar requirements do not exist for other procedures. The Court finds that disparate treatment based upon this justification is legally indistinguishable from that which

was struck down in *Friendship Medical Center, supra; Mahoning Women's Center v. Hunter,* 444 F.Supp. 12 (N.D.Ohio 1977); and *Doe v. Hale Hospital, supra.*

■ Neither can the history of abortion prior to 1973 be relied upon to justify this regulation. Simply because illegal abortions were performed in ways and under conditions which reflected their illegality does not justify restricting the ability of a competent doctor to perform legal first trimester abortion by requiring him or her to have hospital privileges.[9] Defendants have not shown that doctors, such as WMC's Dr. Mehrtash, who do not have staff privileges at accessible hospitals are any less competent to perform safe first trimester abortions than those who have such privileges. The state has many other ways of dealing with the delivery of first trimester abortion services by incompetent personnel or in unsafe conditions, just as it can take action to insure other medical procedures are performed safely by competent doctors. Examples include the authority to license physicians, to suspend or revoke licenses, and to require that a physician perform the procedure, *see Connecticut v. Menillo, supra,* and the threat of malpractice lawsuits. Such regulations are permissible so long as they are part of generally applicable regulations and do not single out first trimester abortions. *See, e. g., Abortion Coalition of Michigan, Inc. v. Michigan Department of Public Health,* 426 F.Supp. 471 (E.D.Mich. 1977). § 602.4.1, however, singles out first trimester abortions.

■ The defendants have failed to adequately justify the disparate treatment which § 602.4.1 gives to doctors performing first trimester abortions. The Court therefore concludes that § 602.4.1 of the Rules and Regulations for the Termination of Pregnancy, State of Rhode Island and Providence Plantations, Department of Health (December 1973) is invalid as a denial of

---

*v. Lawson,* 542 F.2d at 1358. The regulation here challenged is of unequal application, however, so under either approach it is invalid.

9. Indeed, by restricting the availability of physicians who can legally perform first trimester abortions, the likelihood that backroom procedures will continue may be increased.

equal protection under the Fourteenth Amendment and is an unconstitutional restriction on the right, as delineated in *Roe v. Wade, supra* and *Doe v. Bolton, supra,* of women to obtain a first trimester abortion free of interference by the state.

The motion for a declaratory judgment is granted. The Court finds it unnecessary to rule on the motion for injunctive relief, for it assumes the defendants and other prosecutorial authorities in the state will give full credence to this decision that § 602.4.1 is unconstitutional. *Roe v. Wade, supra,* 410 U.S. at 166, 93 S.Ct. 705; *Mahoning Women's Center v. Hunter, supra,* 444 F.Supp. at 17.

An order will be prepared accordingly.